Meyer, J.
(dissenting). Because the majority’s misconceptions accord the Commission a position to which neither the Constitution nor statute entitles it and which impinges upon First Amendment rights, I respectfully dissent.
As the church contends, the basic issue confronting the court is which is to be preferred — religious freedom or the exercise of the police power in furtherance of architectural and cultural interests. First Amendment rights clearly are not absolute, but just as clearly, "freedom of religion [is] in a preferred position” (Murdock v Pennsylvania, 319 US 105, 115). As between the free exercise of religion and the aesthetic and community values involved in landmark preservation, the *526 latter is "outweighed by the constitutional prohibition against the abridgement of the free exercise of religion and by the public benefit and welfare which is itself an attribute of religious worship in a community” (Matter of Westchester Reform Temple v Brown, 22 NY2d 488, 496).
Yet by construing the certificate of appropriateness provision of Administrative Code of City of New York § 207-6.0 more broadly than has the Commission itself, and ignoring the Commission’s arrogation to itself, as part of the hardship procedure established by section 207-8.0, of the "judicial rule” established by Matter of Society for Ethical Culture v Spatt (51 NY2d 449); Lutheran Church v City of New York (35 NY2d 121) and Matter of Trustees of Sailors’ Snug Harbor v Platt (29 AD2d 376), the majority gives the Commission greater power than accorded it by statute or prior judicial decision and in so doing subordinates religious freedom to a secular purpose of lesser importance.
I
The Church of St. Paul and St. Andrew is located on a 150-foot by 125-foot plot at the corner of West End Avenue and 86th Street in Manhattan. Situated on the plot are the church and attached parish house and a separate parsonage or rectory. In January 1980, it was notified by the Landmarks Preservation Commission that it was being considered for possible landmark designation. In opposition to the proposed designation, the church, by its then board chairman, informed the Commission that any designation would render the church insolvent and would likely cause its dissolution because the cost of repairs, as well as the continuing maintenance legally required by the landmark designation, would be impossible to meet and would bankrupt the church by 1981. Notwithstanding that opposition the Commission on November 24, 1981, designated the church and parish house,[1] but not the rectory, an official New York City landmark. Although the designation remained subject to Board of Estimate approval, the letter by which the church was notified of the designation stated that the designation was "in full force and effect from and after *527 the date of the adoption thereof by the commission.”[2] Despite the church’s similar presentation to the member of the Board of Estimate, that body approved the designation on March 18, 1982.
On June 23, 1982, the church began the present action against the city, the members of the Commission and the members of the Board of Estimate, seeking a declaratory judgment that as applied to it the Landmarks Preservation Law is unconstitutional and an injunction against any action to enforce the designation, as well as damages and attorneys’ fees pursuant to 42 USC §§ 1983 and 1988. The complaint alleged that the designation financially and physically prevented or seriously interfered with "the carrying out of plaintiff’s religious and charitable purposes” because of the provisions of the Landmarks Preservation Law (Administrative Code §§ 207-10.0, 207-16.0 [b]) which imposed immediate and mandatory exterior maintenance obligations on all designated landmarks and imposed criminal penalties for noncompliance. Both the duty to make immediate necessary repairs and the continuing obligation to meet the "good repair” provisions of the Landmarks Law, it was alleged, violated the plaintiffs constitutional right to the free exercise of religion and constituted a "taking” of its property without due process or just compensation.
Defendants moved for summary judgment, asserting, among other grounds, lack of ripeness, and submitted affirmations in support of the motion which pointed to the alternatives available to a designee under the Landmarks Law provisions for a certificate of appropriateness (Administrative Code § 207-6.0), by way of a hardship application (§ 207-8.0) and under what was referred to as "the judicially-created test for hardship set forth in Society for Ethical Culture v Spatt, 51 NY2d 449 (1980), Lutheran Church v City of New York, 35 NY2d 121 (1974) and Sailors’ Snug Harbor v Platt, 29 AD2d 376 (1st Dep’t 1968).” They included affidavits of architects concerning possible alterations of the church and parsonage, and an affidavit of the Commission chairman noting that the Commission had not sought either through civil or criminal proceedings to enforce the repair requirements of Administrative Code §§ 207-10.0 and 207-16.0. The latter affidavit also referred to cases in which hardship applications had been *528 granted by the Commission but stated that it was without statutory authorization to consider the alternatives referred to above as a part of the designation proceeding under Administrative Code § 207-2.0 as the church had sought to have done.
The church’s affidavits in opposition noted that although the sanctuary was designed to seat 1,400 worshippers and during the first half of the century had been filled to capacity, its membership in 1981 was approximately 250, of whom only 100 were regular Sunday worshippers. As a result, the congregation is dwarfed by the large sanctuary, which frequently cannot be used because of the prohibitive cost of heating the space.
In relation to the physical and financial condition of the church, the affidavits presented the following data: The heating bill, which was $11,400 in 1974, had advanced in 1979 to $22,500 and in 1982 totaled $34,000. Heating expense plus $9,000 for insurance and $3,000 for emergency repairs in 1982 consumed 70% of all pledges, donations and loans by members of the congregation for that year. Physically, the condition of the building is deteriorating. The Sunday school rooms are inadequate and space is lacking for retreats, seminars and other religious and charitable programs. The balcony of the sanctuary has been closed because it deteriorated to the point of being too dangerous for use. The plumbing facilities are "decrepit,” lighting is poor and there are no elevators for handicapped individuals. As for the exterior, extensive repairs to the roof and masonry are required. Falling stones and masonry fragments are a danger to pedestrians. In addition, leaks in the roof drainage system have rotted large sections of wall. In 1980, it was estimated that exterior repairs in the amount of $250,000 were required. When this action was commenced in 1982, that estimate had risen to $350,000. Other than the buildings and land and a small endowment of approximately $35,000, there are few assets. The church operates with annual pledge income and donations from its membership together with other contributions, which totaled approximately $60,000 in 1982 and barely met the most necessary of salary and maintenance expenses.
In view of its fiscal situation the church established a committee on future alternatives in 1975. A real estate consultant was engaged in an effort to develop a plan that would provide both suitable church facilities and an income source that would ensure the continuation of both its congregational and charitable programs. By August 1980, a proposed plan *529 had been devised that would retain the exterior walls of the church fronting on 86th Street and West End Avenue and the octagonal tower at the corner, but not the square tower at the north end of the front facade or its third story and hip roof, and which would replace the remainder of the building with a new smaller sanctuary and an apartment complex at the rear of the building. It was not pursued, however, after the Commission informed the church that its landmark designation was under consideration. Based on the foregoing data and the repair and maintenance obligations imposed by the law, the church argued that the procedures provided for by statute were inapplicable, that the so-called "judicial” alternatives were not within the competence of the Commission and were ripe for judicial review because the designation with its immediate maintenance and repair obligations prevented or seriously interfered with its ability to carry on its religious and charitable purposes.
Supreme Court noted that "defendants have tacitly conceded that the Church’s claims of financial hardship appear well-founded,”[3] that the church’s proposed plan would require demolition of exterior walls other than those fronting on 86th Street and West End Avenue and that the church’s fear that by applying for administrative relief it would lose the right to control reconstruction of its building was not illogical. It concluded, however, that the interior of the buildings not having been landmarked, it was plaintiff’s lack of funds, rather than the landmark designation, that was interfering with the carrying out of the church’s religious and charitable activity and that, therefore, the Commission must be given the opportunity to devise alternatives before resort to judicial action was appropriate. Because it found the matter not ripe for adjudication, it dismissed the complaint without prejudice to appropriate proceedings after completion of the administrative process, but directed the Commission to provide for expedited consideration of any application made to it. The Appellate Division affirmed, without opinion.
II
A
Although the facial validity of the New York City Land *530 marks Preservation Law as a proper exercise of the police power to preserve the cultural, architectural, historical or social significance of designated properties is beyond question (Penn Cent. Transp. Co. v City of New York, 42 NY2d 324, 330, affd 438 US 104), the constitutionality of its application to a particular parcel turns in part upon the use of the property by its owner. When that use is secular, even though by a religious or charitable organization, the governing standard is that the owner not be deprived of a reasonable return on his property (Matter of Society for Ethical Culture v Spatt, 51 NY2d 449, 454, 456, supra; Penn Cent. Transp. Co. v City of New York, supra; see, Matter of Spears v Berle, 48 NY2d 254, 262; French Investing Co. v City of New York, 39 NY2d 587, appeal dismissed and cert denied 429 US 990). When, however, the use is for a charitable or religious purpose, the standard is that the designation "not physically or financially prevent, or seriously interfere with the carrying out of’ that purpose (Matter of Society for Ethical Culture v Spatt, 51 NY2d, at p 455, supra; Lutheran Church v City of New York, 35 NY2d, at p 131, supra; Matter of Trustees of Sailors’ Snug Harbor v Platt, 29 AD2d 376, supra). This results from the "special status of religious institutions under the First Amendment” (Jewish Reconstructionist Synagogue v Incorporated Vil. of Roslyn Harbor, 38 NY2d 283, 287, 288) "which severely curtails the permissible extent of governmental regulation in the name of the police powers” (Matter of Westchester Reform Temple v Brown, 22 NY2d 488, 496, supra).
When the latter standard applies and the existing building of the religious institution is totally inadequate for its legitimate needs if it is to be able freely and economically to use its premises, landmark designation which by proscribing alteration or demolition invades the owner’s right to own and manage its property is unconstitutional as applied and the municipality must, then, be prepared to "provide agreeable alternatives or condemn the premises” (Lutheran Church v City of New York, 35 NY2d, at p 132, supra). Whether designation of particular buildings is sustainable turns on "whether the preservation of these buildings would seriously interfere with the use of the property, whether the buildings are capable of conversion to a useful purpose without excessive cost, or whether the cost of maintaining them without use would entail serious expenditure — all in the light of the purposes and resources of the petitioner” (Matter of Trustees of Sailors’ Snug Harbor v Platt, 29 AD2d, at p 378, supra).
*531 It is this standard — whether the designation physically or financially prevents, or seriously interferes with the carrying out of the church’s religious and charitable purposes — that the majority holds is unripe for consideration without regard to plaintiffs status as a religious institution because of the availability of the certificate of appropriateness procedure, and that the Commission argues is unripe because of the availability of that procedure, the hardship procedure and the "judicial test.” The arguments advanced simply do not withstand analysis.
B
The importance attached to the appropriateness procedure by the Commission is best evidenced by the fact that its brief devotes but one paragraph to it and concentrates most of its argument on the judicial test it claims power to apply in a section 207-8.0 hardship proceeding. The reason is not hard to find, for the Commission itself has construed the section 207-6.0 appropriateness procedure to apply only to architectural appropriateness. Notwithstanding that fact, the majority finds plaintiffs failure to apply for a certificate of appropriateness determinative of ripeness. In doing so, it ignores both the past constructions of the section by the Commission and the wording of the governing subdivision.
Subdivision (d) deals with the considerations governing an application under section 207-6.0 with respect to an exterior designation such as is here involved. It requires that the Commission "consider the effects of the proposed work upon the protection, enhancement, perpetuation and use of the exterior architectural features of such landmark which cause it to possess a special character or special historical or aesthetic interest or value.” Section 207-1.0 (g) defines "exterior architectural feature” to mean "[t]he architectural style, design, general arrangement and components of all of the outer surfaces of an improvement, as distinguished from the interior surfaces enclosed by said exterior surfaces, including, but not limited to, the kind, color and texture of the building material and the type and style of all windows, doors, lights, signs and other fixtures appurtenant to such improvement.”
What the provision deals with then is solely the architectural appropriateness of proposed changes, and the Commission itself has so construed it. Thus, in denying a certificate of appropriateness for a multistory office building to be con *532 structed above Grand Central Terminal, the Commission, in reasoning applicable as well to the high-rise condominium the church proposed to erect at the rear of its plot, stated:[4]
"[We have] no fixed rule against making additions to designated buildings — it all depends on how they are done * * * But to balance a 55-story office tower above a flamboyant Beaux-Arts facade seems nothing more than an aesthetic joke. Quite simply, the tower would overwhelm the Terminal by its sheer mass. The 'addition’ would be four times as high as the existing structure and would reduce the Landmark itself to the status of a curiosity.
"Landmarks cannot be divorced from their settings — particularly when the setting is a dramatic and integral part of the original concept. The Terminal, in its setting, is a great example of urban design. Such examples are not so plentiful in New York City that we can afford to lose any of the few we have. And we must preserve them in a meaningful way — with alterations and additions of such character, scale, materials and mass as will protect, enhance and perpetuate the original design rather than overwhelm it.”
That appropriateness is limited to architectural appropriateness is borne out also by the Commission’s reference, in denying an earlier proposal in the same case, to a number of instances in which it had approved additions to landmarks: "The office and reception wing added to Gracie Mansion and the school and church house added to the 12th Street side of the First Presbyterian Church are examples that harmonize in scale, material and character with the structures they adjoin. The new Watch Tower Bible and Tract Society building on Brooklyn Heights, though completely modern in idiom, respects the qualities of its surroundings and will enhance the Brooklyn Heights Historic District, as Butterfield House enhances West 12th Street, and Breuer’s own Whitney Museum its Madison Avenue locale.”[5] Nor has the Commission’s view changed in the intervening years, for in 1025 Fifth Ave. v Marymount School (123 Mise 2d 756) it denied a certificate of appropriateness to a Catholic college preparatory school which had no on-site gymnasium because the plans submitted clashed with and detracted from the facades of the school building, but then granted the college’s hardship application *533 because without the gymnasium the college buildings were inadequate for carrying out its purpose (123 Misc 2d, at pp 75S-759).[6]
The majority’s insistence on the church’s use of the appropriateness procedure misconceives both the factual background of the present case and the statutory framework. Thus, its statement (majority opn, at p 516) that "plaintiff does not" assert that the Landmarks Law compels it to "maintain and retain an unsuitable building which it wants to demolish” (emphasis in original) is true only in the sense that the West End Avenue and 86th Street retaining walls and the octagonal tower would be retained. Ignored are the affidavits of Chairman Gurley and Reverend George which point up the unsuitability of the enormous sanctuary and the small and misshaped rooms used only with difficulty for other church pursuits and the consequent necessity for reduction of the sanctuary and rearrangement of the first and second floors to provide usable offices, meeting rooms and Sunday school space. Ignored also is the memorandum of the Commission’s executive director reporting that the church wished "to explore having a portion of the complex demolished and a new structure built which wraps up and around the main building.”
With respect to the statutory framework, the majority takes the church to task for "its aversion to ceding any control of the building program to the Commission” (majority opn, at p 517). But, as the church contends, the basic issue here is which is to be preferred — religious freedom or architectural and cultural interests. The Commission has no statutory authority to deal with the hardship issue with respect to religious and charitable organizations, that issue being for the courts. To give it the leverage to deal with appropriateness as something more than architectural appropriateness, as the majority opinion does, after the designation is an accomplished fact and the religious organization incurs maintenance obligations under threat of criminal sanctions and without regard to the organization’s financial situation, is in effect to permit hardship, not a function of the Commission with respect to a church, to be negotiated under the guise of appropriateness and is wholly inconsistent with the church’s First Amendment rights.
*534 c
Both the majority (n 2) and the Commission concede, as indeed they must in view of our holding in Lutheran Church v City of New York (35 NY2d, at p 124, supra), that section 207-8.0, involving as it does a requirement of sale or lease by the owner of the landmarked building, is inapplicable to a religious corporation[7] apart from the "judicial test” declared in Matter of Society for Ethical Culture v Spatt (supra); Lutheran Church v City of New York (supra); and Matter of Trustees of Sailors’ Snug Harbor v Platt (supra). It is, however, a gross distortion of those cases to suggest, as does the Commission, that it, rather than the courts, is empowered to grant dispensations of the statutory requirement or to negotiate, rather than provide, "agreeable alternatives.”
First, the cases themselves spell out that whether the designation as applied to a tax-exempt institution is sustainable is a question for the court, not the Commission. Snug Harbor expressly so stated (29 AD2d, at p 378): "However, the * * * provisions in regard to property devoted to charitable uses are limited to the instance where the institution desires to alienate the property by sale or lease (§ 207-8.0, subd. a, par. [1], subpar. [b], cl. [2]). We agree with Special Term that this does not render the statute unconstitutional. It must be interpreted as giving power to the commission to provide relief in the situation covered by the statute, but not restricting the court from so doing in others.” (Emphasis supplied.) Lutheran Church, which, like the present case, sought a declaration of invalidity of the landmark designation of a religious institution which had not applied for administrative relief, was decided by this court, the plaintiff’s proof of economic hardship being substantially unchallenged (35 NY2d, at p 128), and the Ethical Culture decision, likewise by this court, turned on our conclusion that its modification was for secular rather than religious purposes.[8] Upon what authority, then, the Commission reads the test into the hardship provision of *535 section 207-8.0 and thus empowers itself, rather than the courts, to grant dispensations of the statutory requirements is nowhere explained. Second, there is a clear anomaly in the Commission’s refusal during the 15 months that it had the designation of plaintiff’s church under review to consider the judicial test alternatives as part of the designation proceeding, as plaintiff requested, on the ground that the statute does not authorize it to do so, while at the same time insisting that alternatives must be sought as part of a hardship proceeding, despite the fact that the statute does not authorize that either. It is no answer to say that the statute must be read as though it had been amended by the Legislature (see, People v Finkelstein, 9 NY2d 342, 345), for the judicial rule can as readily be read to amend the designation procedure under Administrative Code § 207-2.0 as the hardship procedure under section 207-8.0. Third, Lutheran Church ruled that "[w]here the owner can make a case for alteration or demolition the municipality would have to relinquish the designation, provide agreeable alternatives or condemn the premises” (35 NY2d, at p 132, supra; emphasis supplied). Just how the municipality’s power to provide alternatives agreeable to the church has been transmogrified into authorization to the Commission to approve or disapprove the church’s plan, as distinct from relinquishing the designation or condemning the premises, is nowhere revealed. Finally, it is of more than minor significance that the statute has not been amended since 1977, despite our aside in the Penn Cent, case,[9] for the failure of the Legislature to do so suggests a legislative intent that the issue remain one for the courts rather than the Commission (see, La Guardia v Cavanaugh, 53 NY2d 67, 76).
D
It is against that background that the ripeness of the present proceeding is to be assessed. The general rule is that a request for an injunction or a declaratory judgment is premature if the harm to the plaintiff is contingent upon events that may never occur (Matter of New York State Inspection, Sec. & Law Enforcement Employees v Cuomo, 64 NY2d 233, 240; New York Public Interest Research Group v Carey, 42 NY2d 527, 531). But, as already noted, here, as in Lutheran Church *536 (supra), plaintiffs proof of economic hardship is unchallenged by defendants on this motion and here, as in Lutheran Church, it was the designation, "the application of the statute to appellant’s building, which enabled the appellant to relate the designation to the irreparable harm to appellant caused thereby” (27 AD2d 237, 239, on further appeal 42 AD2d 547, mod, over a dissent as to ripeness, to declare designation unconstitutional 35 NY2d 121). The more particularly is this so in view of the Administrative Code provision making the designation effective from the date of adoption (see, n 2, supra) and of the obligation thus immediately imposed, subject to criminal prosecution for noncompliance (Administrative Code § 207-16.0 [b]), of maintaining in good repair not only the exterior of the church but also all interior portions that may tend to cause the exterior to deteriorate (Administrative Code § 207-10.0 [a]), for even though the Commission has thus far taken no steps toward prosecution, the possibility of its doing so necessarily affects the church’s actions and the allocation of its meager resources (Abbott Labs, v Gardner, 387 US 136, 152; Phillips Petroleum Co. v Federal Energy Admin., 435 F Supp 1239, affd sub nom. Standard Oil Co. v Department of Energy, 596 F2d 1029).
The majority’s insistence upon conserving judicial resources by subjecting the church’s rebuilding plan to the Commission’s approval under the guise of appropriateness misconstrues not only the appropriateness provisions of the Administrative Code but also decisional law and text authority as to ripeness.
First, it is suggested that a controversy is unripe if it involves the resolution of factual issues (majority opn, at p 519). But, as already noted, Special Term found that defendants had tacitly conceded that the church’s claim of financial hardship appears well founded, and the Commission not having controverted the claims in that respect set forth in the church’s affidavit answering the motion for summary judgment, those claims must be accepted as true. And, to paraphrase Davis (Administrative Law, vol 4 § 25.13, at 402 [2d ed]), with respect to a decision granting summary judgment "the facts [being] undisputed * * * the only question [is] one of law [and] the reason for relieving [plaintiff] from [its] dilemma [is] peculiarly strong”. Thus, it simply begs the question to suggest, as does the majority (at p 522), that the constitutional question whether there is interference with plaintiff’s ability to carry out it religious and charitable pur *537 poses requires "a careful examination of facts not yet developed pertaining to plaintiffs financial situation”.[10]
Second, that criminal sanctions have not been threatened by the Commission should not foreclose consideration now of the constitutional question presented. The Landmarks Law imposes criminal sanctions for failure to carry out the affirmative duty of maintenance and repair imposed by section 207-10.0 as well as for violation of the negative limitations imposed by section 207-4.0 against constructing any improvement on the land within the landmark site or altering any improvement constituting a part of such site. The affront to plaintiff’s religious freedom is that in order to achieve the financial basis necessary for it to carry out its religious and charitable work it must submit not just to the preservation of the 86th Street and West End Avenue exterior walls that have been landmarked but also to the Commission’s intermeddling in its over-all rebuilding plan or establish to the satisfaction of the Commission, in the guise of the Commission providing it with a reasonable alternative, that its financial situation is such that it should be permitted to partially demolish and rebuild the existing structure.
Judicial resources are hardly conserved by forcing the litigation of a constitutional issue out of the declaratory judgment mold and into criminal litigation, except perhaps as some, less dedicated to principle than plaintiffs governing board, may be intimidated into giving up the fight. Nor do the Supreme Court cases or the text authority on which the majority relies sustain the conception that a criminal proceeding is the only answer. Indeed, Abbott Labs. v Gardner (supra), on which the majority so heavily relies, held "sufficiently direct and immediate as to render the issue appropriate for judicial review” the impact of regulations requiring that plaintiff incur costs in relabeling where the alternative to compliance would "risk serious criminal and civil penalties” and thus "may be even more costly” (387 US, at pp 152-153), notwithstanding the Solicitor General’s representation that the Government would not enforce the regulation by criminal proceedings (id., at p 154). So also in Epperson v Arkansas (393 US 97) a teacher *538 obligated by Arkansas statute not to teach the theory of evolution was held entitled to a declaration that the statute was in violation of the First Amendment because she faced the dilemma of teaching the statutorily condemned material or subjecting himself to dismissal and criminal prosecution.[11] And Davis tells us that the Abbott decision established that "governmental action is ripe for challenge when it places the challenging party in a dilemma of incurring the disadvantages of complying or risking penalties for noncompliance” (op. cit. § 25.7, at 373), that "[t]he general principle of ripeness law now is that a statute, regulation or policy statement is ripe for challenge when an affected person has to choose between disadvantageous compliance and risking sanctions” (id. § 25.13, at 393) and in an italicized statement that "[t]he basic proposition [is] that administrative action which creates a dilemma for a private party who must choose between disadvantageous compliance and risking serious penalties is ripe for challenge” (id. § 25.6, at 369).
Third, the majority’s concept of harm is also skewed. Abbott teaches that it is "the hardship to the parties” that is to be considered (387 US, at p 149). Of importance, then, is whether the loss to the public will be any greater if a preenforcement suit is allowed and, even if the public loses something by preenforcement consideration, whether that loss outweighs the private advantage of allowing such a suit (Davis, op. cit. § 25.6, at 372; see, National Automatic Laundry & Cleaning Council v Shultz, 443 F2d 689, 702 ["The ultimate question is whether the problems generated by pre-enforcement review are of such a nature that, taken together, they outweigh the hardship and interest of plaintiffs members and establish that judicial review of the interpretative ruling should be deferred”]). There is not the least suggestion in the majority opinion or in the Commission’s brief that present consideration of the issue sought to be presented by plaintiff will harm the statutory program in any way, unless we count the possible invalidation of the Commission’s effort to arrogate to itself the determination of constitutional issues which we have very plainly said is for the courts, not the Commission.
Though nothing will be gained by way of conservation of *539 judicial resources (unless the church runs out of the physical or financial stamina with which to continue its fight) and no harm of which we can properly take cognizance can come to the Commission by entertainment now of the present action, there is a very real and immediate hardship to plaintiff. Already mentioned is the potential for interference with the religious and charitable functions of a special status institution such as the plaintiff church resulting from the maintenance and repair requirements, enforceable by criminal prosecution, which landmark designation imposes. When such consequences result from governmental action the right to be heard in opposition, in order to be meaningful, must ordinarily occur before the action is taken (Fuentes v Shevin, 407 US 67, 80-81).[12] There is, to be sure, an exception for summary administrative action when protection of public health or safety so requires (Hodel v Virginia Surface Min. & Reclamation Assn., 452 US 264, 299-300), but landmark designations involve cultural and aesthetic considerations, not health or safety. Moreover, there is nothing summary about the hardship procedure. Were the Commission’s argument accepted substantial postdesignation time — well in excess of 180 days— would be consumed by the various steps required by section 207-8.0. But aside from the maintenance and repair requirements, the church faces the very real possibility that its program for obtaining the means necessary to carry on its religious and charitable work will be thwarted by its financial position and the time and effort to litigate through all the procedural steps to which the majority and the Commission would subject it. Thus will the very problem which created the need for rebuilding to preserve its religious and charitable status be subordinated to cultural and aesthetic considerations not of equal importance constitutionally.
E
There remains for consideration the majority’s argument that recent Supreme Court cases support the conclusion that the present controversy is not ripe. The cases referred to (Williamson County Regional Planning Commn. v Hamilton *540 Bank, 473 US —, 105 S Ct 3108; and Hodel v Virginia Surface Min. & Reclamation Assn., supra) involved just compensation for the taking of commercial property, not the First Amendment and due process considerations here involved. They are, in any event, distinguishable on the additional ground that each involved a land development statute of general applicability which included provision for variance of the statutory regulation, but no provision of which imposed an immediate and affirmative obligation upon the landowner similar to the civilly and criminally enforceable maintenance and repair obligations contained in the Landmarks Preservation Law.
Ill
Because on the record before us the landmark designation itself inflicts immediate, concrete injury upon the protected First Amendment activities of plaintiff church, I conclude that the action is not premature. The order of the Appellate Division should, therefore, be reversed, with costs, and defendant’s motion for summary judgment denied.
Chief Judge Wachtler and Judges Kaye and Titone concur with Judge Hancock, Jr.; Judge Meyer dissents and votes to reverse in a separate opinion in which Judges Simons and Alexander concur.
Order affirmed, with costs.

. The affidavit of the Commission chairman states that only the exterior of the church and parish house were designated. The designation as contained in the record before us, however, reads "designates as a Landmark the Church of St. Paul and St. Andrew”.

. New York City Administrative Code § 207-2.0 (e) so provides, subject to review by the City Planning Commission and the Board of Estimate.

. Defendants’ brief disclaims such a concession, but for purposes of defendant’s summary judgment motion the church’s claims, not having been controverted in defendant’s reply affidavit, must be accepted as true.

. Quoted in Penn Cent. Transp. Co. v New York City (438 US 104, 117-118).

. Id., 438 US, at p 118, n 18.

. The 1025 Fifth Ave. action was instituted by two cooperative corporations owning apartment houses adjacent to the college in an effort to overturn that grant. The determination of the Commission is set forth in full as part of the record in the present case.

. The footnote appearing at page 455 of the Ethical Culture opinion (51 NY2d 449) is not to the contrary. It speaks to the reasonable return requirement for private owners, not the more stringent requirement for religious and charitable institutions. The holding of Ethical Culture was, as already noted, that the alteration it involved was for secular rather than religious purposes.

. Because the Commission has not sought to controvert the church’s allegation that the proposed condominium is essential to its financial survival, the same conclusion cannot be reached on the present motion.

. (42 NY2d, at p 337): "The statute needs improvement. In some cases it protects property owners inadequately (Lutheran Church in Amer. v City of New York, 35 NY2d 121 * * *).”

. Nor can the church’s lack of funds be separated from its religious and charitable purposes as Supreme Court suggested, the proposed partial demolition and rebuilding of the church being a use of its premises not for secular purposes but to provide the means of carrying on its religious and charitable work and a use to which it is legally entitled but for the landmark designation.

. Of note in that connection is the fact, brought out in the concurring opinion of Mr. Justice Black, that though the statute was 40 years old there had "never been even a single attempt by the State to enforce it” fid., at p 109).

. The reference in footnote 13 of the Supreme Court’s opinion in Penn Cent. Transp. Co. v New York City (438 US 104, 113) to our Lutheran Church opinion is not to the contrary, for, as noted above in this opinion, the Lutheran Church action was addressed to the designation, which was held unconstitutional as applied.